# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 19-60816-CIV-ALTMAN/Hunt

**MELISSA H. MEYER,** *et al.*,

    Plaintiffs,

v.

**SUITABLE MOVERS, LLC**, *et al.*

    Defendants.

_____/

## **ORDER**

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss (the "Motion") [ECF No. 66], filed on May 20, 2019. The Plaintiffs filed a Response in Opposition (the "Response") [ECF No. 71] on May 25, 2019. And the matter ripened on June 6, 2019, when the Defendants filed their Reply (the "Reply") [ECF No. 87].

## **THE FACTS**[1]

The Plaintiff, Melissa H. Meyer, is the mother of Emma Meyer and the owner of The Eyeglass Lady, LLC. In 2018, Meyer decided to move her family from Florida to the State of Washington. To facilitate this cross-country move, Meyer contacted the Defendant, Suitable Movers, LLC ("Suitable Movers"), and spoke directly with the owner, Defendant Jaimie Perez. After some negotiation, Meyer and Perez agreed that Suitable Movers would move, not only Meyer's personal belongings, but also the Eyeglass Lady's inventory, from Florida to Washington.

On January 5, 2019, Suitable Movers loaded both Meyer's household goods and Eyeglass

---

[1] The Court takes the below facts from the Plaintiff's Second Amended Complaint (the "SAC") [ECF No. 25].

Lady's entire business inventory into a moving van and left for the Suitable Movers warehouse in Sunrise, Florida. Suitable Movers apparently did not offer Meyer insurance coverage for her goods. At the warehouse, the Plaintiffs' goods were unloaded from the moving van and packed onto a truck owned and operated by the Defendant, Carlyle Van Lines, Inc. ("Carlyle"). That truck was driven by the Defendant, Raymond Wells. At some point after the goods arrived at the warehouse, Perez called Meyer and told her that, because her shipment included goods she had not initially disclosed, her move would cost more than they had initially agreed. After some back and forth, Perez and Meyer agreed on a higher price.

Wells, driving the truck, departed Sunrise and headed to Jacksonville, where he stopped to load the belongings of several other individuals—Michael Barnosky, Jenna Barnosky, Joshua Dietrich, and Matthew Woodford—who were likewise moving their things to the Pacific Northwest. Wells then proceeded to Dothan, Alabama, where he picked up the household goods of Seneca Pena-Collazo. Now fully loaded, Wells and his truck finally departed for Washington.

On January 11, 2019, as Wells was driving through Arkansas, a fire unexpectedly started along the right rear wheel of the trailer. Although Wells did not, at first, notice the fire, he was soon alerted to it by a passing motorist who flagged him down. Unfortunately, by the time firefighters arrived, all of the cargo was destroyed. The fire department concluded that the fire was caused by the "failure of equipment or heat source."

Eventually, the police arrived and questioned Wells, who told them that he was carrying the cargo of four military families. Because Wells did not inform the police about the Plaintiffs' goods, the police initially contacted only the military families about the fire. On January 12, 2019, however, after Meyer called Perez to ask about her goods, Perez told her something to the effect of "I am sorry to tell you this but there was a brake malfunction which caused a fire and

2

everything is gone." Ultimately, Perez returned Meyer's entire deposit.

Days later, Meyer reached out to Alma Salvage, the scrap yard where the rubble was being held, to arrange for her to retrieve her belongings. According to the SAC, Alma Salvage initially had no problem with Meyer searching through the wreckage—but George Crumbly, an adjuster for Carlyle, did. For reasons that are left unexplained, Crumbly told Alma Salvage that Meyer should be prohibited from gathering her belongings from the wreckage. And, the SAC avers, because Alma Salvage depends on Missouri-based Carlyle for work, its owner—who did not wish to "make waves"—pliantly forbade Meyer from accessing her belongings.

## THE LAW

The Carmack Amendment, enacted in 1906, established a uniform, nationwide framework that governs the liability of inter-state carriers for property loss. *See New York, N.H. & H. R. Co. v. Nothnagle*, 346 U.S. 128, 131 (1953); *see also* 49 U.S.C. § 14706 *et. seq.* Its reach is comprehensive: "Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it." *Adams Express Co. v. Croninger*, 226 U.S. 491, 506 (1913).

The Carmack Amendment thus preempts all state-law claims arising from the inter-state transportation and delivery of goods. *See id.* at 505–06; *see also Southeastern Express Co. v. Pastime Amusement Co.*, 299 U.S. 28, 29 (1936) (negligence claims preempted); *New York, Philadelphia & Norfold R.R. Co. v. Peninsula Produce Exch. of Md.*, 240 U.S. 34, 38 (1916) (Carmack Amendment preemption is "comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination"); *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1247–48 (11th Cir. 2002)

(Carmack Amendment preempts state-law fraud, negligence, wantonness, and outrage claims). Indeed, the Eleventh Circuit has said that only claims "based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption." *Smith*, 296 F.3d at 1249.

## ANALYSIS

In their joint Motion to Dismiss, the Defendants argue that the Carmack Amendment preempts all of the Plaintiffs' state-law claims. *See generally* Mot. The Plaintiffs parry with five arguments in response. *First*, they claim that, because the Defendants failed to provide Meyer with a bill of lading, the Defendants have failed to satisfy the "prerequisites" for Carmack Amendment preemption. *See* Response at 6–9. *Second*, they say that their claims are not preempted because those claims are "separate and distinct from the Cargo Loss." *See id.* at 10–12. *Third*, they argue that their claims against Suitable Movers cannot be preempted because Suitable Movers is an *intra*-state shipper *See id.* at 12–14. *Fourth*, they contend that their claims against Perez cannot be preempted because Perez was merely a "broker," and not a "carrier," as those terms are defined under the law. *See id.* at 13–14. And *Fifth*, they assert that they have properly stated viable claims against Vanliner. *See id.* at 18 These arguments are, in each case, unpersuasive.

*First*, the presence of a bill of lading is not, as the Plaintiffs suggest, a "prerequisite" for Carmack Amendment preemption. As the statute itself makes plain: "Failure to issue a receipt or bill of lading does not affect the liability of a carrier." 49 U.S.C. § 14706(a)(1). Notably, the Plaintiffs do not—because they cannot—point to a single statute, regulation, or case in support of their position that Carmack Amendment preemption is somehow contingent upon the presentation of a bill of lading, and the Court likewise has found no such case. To the contrary, the law in this regard is "that such a bill of lading is irrelevant to the applicability of the Carmack

Amendment." *Hubbard v. All States Relocation Servs., Inc.*, 114 F. Supp. 2d 1374, 1381 (S.D. Ga. 2000).

*Second*, the Plaintiffs have not, as they insist, raised any claim that is "separate and distinct from the Cargo Loss." *See* Resp. at 10. Indeed, despite filing an eight-count complaint against five defendants, the Plaintiffs seek precisely *the same* damages for each count—$575,000, which they say includes "the loss of [Meyer's] Household Goods, life long personal and sentimental belongings, and entire business inventory." *See, e.g.*, SAC ¶ 82. Since all of these losses occurred during the cargo fire, the Plaintiffs have made no claim for losses that are "separate and distinct from the Cargo Loss." And, as the Fifth Circuit has explained, "the Carmack Amendment preempts *any common law remedy* that increases the carrier's liability beyond the actual loss or injury to the property unless the shipper alleges injuries separate and apart from those resulting *directly from the loss* of shipped property." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 382 (5th Cir. 1998) (citing 49 U.S.C. § 11707(a)(1)) (emphasis added) (cleaned up). Because the Plaintiffs allege no injury "separate and apart from those resulting *directly from the loss* of shipped property," all of their claims are preempted by the Carmack Amendment.

*Third*, the Plaintiffs' argument that the Carmack Amendment does not apply to Suitable Movers because that Defendant handled only the <u>intra</u>-state leg of the move is meritless. "It is well-settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment." *State of Texas v. Anderson, Clayton & Co.*, 92 F.2d 104, 107 (5th Cir. 1937), *cert. denied*, 302 U.S. 747 (1937). Because the Plaintiffs contracted with Suitable Movers to move their goods from Florida to Washington, that shipment—from the

5

moment it left Meyer's home—was conducted under the auspices of the Carmack Amendment. And the federal courts routinely apply Carmack Amendment preemption to shippers, like Suitable Movers, that handled only the <u>intra</u>-state leg of an <u>inter</u>-state (or foreign) shipment. *See, e.g.*, *Fine Foliage of Fla., Inc. v. Bowman Transp., Inc.*, 698 F. Supp. 1566, 1571 (M.D. Fla. 1988), *aff'd*, 901 F.2d 1034 (11th Cir. 1990).

*Fourth*, the Plaintiffs cannot escape Carmack Amendment preemption by alleging, in their Response to the Motion, that Perez was a "broker" and not a "carrier." The Interstate Commerce Act, which the Carmack Amendment amends, defines a "motor carrier" as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Conversely, a "broker" is defined as a person "other than a motor carrier . . . that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation . . . as selling, providing, or arranging for, transportation by motor carrier for compensation." *See id.* at (2). Accordingly, the dispositive question here is whether Perez *provided* transport, or whether, instead, he merely <u>offered</u> *to provide* transport. In the SAC, the Plaintiffs aver that "[t]he Defendant, **JAIMIE PEREZ** *delivered the Plaintiffs' Household Goods*." SAC ¶ 117 (emphasis added). The Plaintiffs' allegations thus make clear that Perez *provided* transport and, as such, that he acted as a "carrier," and not a "broker," under the law.

*Fifth*, the Plaintiffs have failed to state a claim against Vanliner. The SAC asserts three claims against Vanliner: one for aiding and abetting, *see* SAC at 33; one for violation of the Florida Unfair and Deceptive Trade Practices Act (the "FDUTPA"), *see id.* at 34; and a third for civil conspiracy, *see id.* at 36.

But, taking the last of these first, "Florida does not recognize civil conspiracy as a freestanding tort." *Banco de los Trabajadores v. Corez Moreno*, 237 So. 3d 1127, 1136 (Fla. 3d

6

DCA 2018) (citing *SFM Holdings Ltd. v. Banc of Am. Secs., LLC*, 764 F.3d 1327, 1338–39 (11th Cir. 2014) (applying Florida law)). Instead, civil conspiracy is a "vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability." *See Lorillard Tobacco Co. v. Alexander*, 123 So. 67, 80 (Fla. 3d DCA 2013). Since the SAC fails to allege any underlying tortious conduct, it necessarily fails to state a viable civil conspiracy claim under Florida law.

Similarly, Florida law is pellucid that "FDUTPA does not apply to insurance companies." *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1226 (S.D. Fla. 2010). Because Vanliner is indisputably an insurance company, *see* SAC ¶ 16, the Plaintiffs cannot bring a valid FDUTPA claim against Vanliner.

The Plaintiffs' aiding and abetting claim fares little better because the SAC does not adequately allege any underlying fraud. To state a viable claim for aiding and abetting fraud, a plaintiff must allege that "(1) there existed an underlying fraud; (2) the defendant had knowledge of the fraud; and (3) the defendant provided substantial assistance to advance the commission of the fraud." *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11-60670-CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012). Here, instead of alleging either an "underlying fraud" or Vanliner's "substantial assistance" to that fraud, the SAC inappositely cites to unrelated salvage regulations, *see* SAC ¶ 126, and refers to a seemingly irrelevant injury to an unaffiliated third party, *see id.* ¶ 125. Neither of these immaterial references can sustain the SAC's deficient aiding and abetting claim.

The Defendants also argue that the Plaintiffs' Complaint is a "classic 'shot gun pleading.'" *See* Mot. at 3. The Court agrees. When a complaint is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action," it is

subject to dismissal as a shotgun pleading. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322 (11th Cir. 2015). At its core, the Plaintiffs' claim is relatively straightforward: Meyer contracted to move her belongings from Florida to Washington and, along the way, the moving truck burned. Rather than plainly pleading those facts, however, the Plaintiffs instead allege a fanciful conspiracy that spans eight counts, includes five Defendants, and somehow implicates the Mayor of Mulberry, Arkansas, *see* SAC ¶ 49, United States Senator John Boozman, *see id.* ¶ 50, four "military" families, *see id.* ¶ 43, the United States Department of Defense, *see id.* ¶ 59, and even a literal smoking gun, *see id.* ¶ 49. If the Plaintiffs choose to amend their complaint, these and other similar allegations should be left out. Because this Court's deadline to amend pleadings was June 4, 2019, *see* Scheduling Order [ECF No. 49] at 2, any future dismissal will be *with prejudice*.

******

Accordingly, the Court hereby

**ORDERS and ADJUDGES** that the Defendant's Motion to Dismiss [ECF No. 66] is **GRANTED**. The SAC [ECF No. 25] is **DISMISSED without prejudice**. The Plaintiffs may file an amended complaint no later than **August 14, 2019**. The Clerk of Court shall **CLOSE** this case for administrative purposes only. Any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Fort Lauderdale, Florida this 30th day of July 2019.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record